NMA:DAL
F#2009R01418

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

  - against -

VICTOR GORDON,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - -X

Cr. No. <u>11-517 (S-1)(KAM)</u>

<br>

## <u>THE GOVERNMENT'S SENTENCING MEMORANDUM</u>

<br>

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Darren A. LaVerne
Assistant U.S. Attorney
(Of Counsel)

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum in advance of the sentencing of defendant Victor Gordon.   As is set forth below, this case presents one of the most significant and egregious examples of an individual violating the laws against trafficking in elephant ivory that has come before a court for sentencing in the United States.  An appropriate sentence must reflect, in particular, (i) the seriousness of this offense, which is increasingly the focus of national and global law enforcement and policy efforts; (ii) the importance of general deterrence, which courts have recognized has special relevance in this context; (iii) the unusually large amount of illegal ivory involved in this case; (iv) the duration of the crime, which stretched for nearly a decade; (v) the manner in which the crime was committed, including the fact that the defendant, on multiple occasions, paid a coconspirator to obtain ivory directly from Africa and smuggle it into the United States; and (vi) the defendant's significantly greater culpability relative to the six defendants previously sentenced by the Court in a related case, <u>United States v. Sylla, et al</u>.

For these reasons, as well as the reasons further set out below, the government respectfully submits that a sentence within the applicable Guidelines range of 30 to 37 months' imprisonment is sufficient but not greater than necessary to comply with the purposes of sentencing set out in 18 U.S.C. § 3553(a).

<u>BACKGROUND</u>

I.      <u>The Illegal Trade in Elephant Ivory</u>

On July 1, 2013, President Obama issued an executive order establishing the Presidential Task Force on Wildlife Trafficking (the "Task Force"), to be co-chaired by the Secretary of State, Secretary of the Interior and Attorney General, or their designees, reporting to

the President through the National Security Advisor.  (See Exhibit A (Executive Order 13648 –

Combatting Wildlife Trafficking)).  The Task Force, which, in February 2014, promulgated a

National Strategy for Combatting Wildlife Trafficking (the "National Strategy"), also includes

senior-level representatives from the Departments of Defense, Treasury, Homeland Security,

Commerce and Agriculture, as well as numerous other agencies.  As is evident from the

composition of the Task Force, and as is noted in the executive order itself, the poaching of

protected species, including elephants, and the illegal trade in the body parts of those species,

affects "the national interests of the United States" and, for that reason, has become a policy and

law enforcement priority.  In addition to causing great environmental harm, as well as pain,

suffering and death to the trafficked animals themselves, the trade "generat[es] billions of dollars

in illicit revenues each year, contribut[es] to the illegal economy, fuel[s] instability, and

undermin[es] security."  (Exhibit A at 1).   In announcing its National Strategy, the Commission

noted that it is intended to "strengthen U.S. leadership on addressing the serious and urgent

conservation and global security threat posed by illegal trade in wildlife."  (See Exhibit B ("Fact

Sheet: National Strategy for Combating Wildlife Trafficking & Commercial Ban on Trade in

Elephant Ivory")).

The creation of the Task Force comes, in part, as a response to spiking levels of

illegal poaching of African elephants, which are being slaughtered to supply the global market

for their ivory tusks.  A study published in March 2013 found that the population of forest

elephants in Central Africa dropped by 62% during the years 2002 to 2011.  (See Exhibit C

(Fiona Maisels, et al., "Devastating Decline of Forest Elephants in Central Africa," PLOS ONE

8(3), March 4, 2013)).  In 2012, a series of articles published in The New York Times

documented the "epic elephant slaughter" taking place in the Democratic Republic of Congo,

2

Gabon and elsewhere in Africa, involving armed militias like the Lord's Resistance Army and other organized criminal groups, which use the profits from the sale of elephant ivory to purchase firearms and fund criminal activity.   (See  Exhibit D).[1]

The African elephant population is being destroyed to feed the robust worldwide demand for ivory. The largest market for elephant ivory is in Asia, in particular China.  But the United States is also a significant market for this illicit trade, and, as with so many global issues, the manner in which the United States addresses the problem is being closely watched by the rest of the world.  (See Exhibit E (Dec. 9, 2013 Letter from Sen. Diane Feinstein to Secretary of State John Kerry) ("While estimates of the extent of the world's illegal ivory trade vary greatly, by all accounts a very significant amount of trafficking occurs within our borders."))  In addition to being a global and national issue, in New York – and, in particular, this District, containing, as it does, one of the busiest international airports in the world – ivory trafficking is also now a local issue.  In January 2014, the New York State Assembly Standing Committee on Environmental Conservation held hearings "on ways to improve the effectiveness of the state's laws and regulations protecting endangered species and restricting the sales of ivory."  (See Exhibit F (Notice of Public Hearing)).  The Notice of Public Hearing issued in connection with the hearings stated, "Despite the existing legal protections, New York has become one of the leading destinations in the United States for illegal ivory."  (Id.)

II.    Laws Governing Importation of Ivory into the United States

While the illegal trade in elephant ivory has attracted increasing attention in recent years, it has been the subject of regulation in the international community and the United

---

[1]      See also "Report of the Secretary-General on the activities of the United Nations Regional Office for Central Africa and on the Lord's Resistance Army-affected areas," at 3, available at http://www.un.org/en/ga/search/view_doc.asp?symbol=S/2013/671.

3

States for decades.  Regulation in the United States had been accomplished through both international and domestic law, including by criminal statute.

    A.    <u>CITES</u>

       In 1974, the United States became the first nation to ratify the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES" or "the Convention"), which was signed in Washington D.C. and took effect the following year.  <u>See</u> 27 U.S.T. 1087, 1975 WL 165483.  Presently, CITES, which is designed to provide an international framework to control trade in endangered plant and animal species, has 180 parties.  The Convention provides that "[t]he Parties shall not allow trade in specimens of species included in Appendices I, II and III [of CITES] except in accordance with the provisions of the present Convention."  CITES, art. II.  Protected species are listed on each of the Appendices.

       CITES Appendix I includes species that are threatened with extinction and thus subject to the strictest regulation.  CITES provides that the export of any specimen of a species in Appendix requires presentation of an export permit from the country of export.  The importation of any such specimen requires the presentation of an import permit from the country of import <u>and</u> either an export permit or re-export certificate from the country of export.  Such permits are to be granted only under limited circumstances.  Among other things, an import permit may only be granted where the specimen "is not to be used for primarily commercial purposes." CITES, art. III.

       International trade in the species listed on CITES Appendix II is subject to regulation as well, albeit less stringent than those on Appendix I.  A specimen of an Appendix II species may not be exported without presentation of an export permit, which may only be granted where, among other things, the nation of export has advised that export of the specimen

4

will not be detrimental to the survival of the species, and that the specimen was not obtained in violation of the laws of that nation for protection of fauna and flora.  While no import permit is required under the Convention for a specimen of an Appendix II species, import of a listed species requires presentation of either an export permit or a re-export certificate issued by the country of export.   CITES, art. IV.

With respect to both Appendices I and II, the Convention's provision do not apply if the nation of export has issued a certificate indicating that a specimen was acquired prior to the inclusion of that species in CITES.  CITES, art. VII.[2]

The African elephant, known as <u>Loxodonta africana</u>, was added to CITES Appendix II in 1977.  In January 1990, following action by the CITES conference in 1989, the African elephant was added to Appendix I.

B.     <u>U.S. Laws Prohibiting Violation of CITES</u>

In the United States, violations of CITES have been punishable under domestic criminal law since the Convention entered into force.  The smuggling statute, 18 U.S.C. § 545, has long made criminal the fraudulent or knowing importation of goods into the United States "contrary to law."  In 1973, Congress enacted the Endangered Species Act, 18 U.S.C. § 1531 <u>et seq.</u>, which makes it a crime "for any person subject to the jurisdiction of the United States to engage in any trade in any specimens contrary to the provisions of [CITES], or to possess any specimens traded contrary to the provisions of [CITES]."  18 U.S.C. § 1538(c)(1).  A series of regulations have been promulgated pursuant to the statute.  <u>See</u> 50 C.F.R. Parts 14 and 23.

In 1981, Congress supplemented and strengthened these provisions by enacting the Lacey Act, which, among other things, makes it unlawful to "import, export, transport, sell,

_____

[2]     There are other limited exceptions as well listed in Article VII, not relevant to this case, including where the specimens are "personal or household effects."  CITES, art. VII.3(a).

receive, acquire, or purchase any fish or wildlife or plant taken, possessed, transported, or sold in violation of any law, treaty, or regulation of the United States."  16 U.S.C. § 3372(a)(1).  And in 1989, the same year the African elephant was added to CITES Appendix I, Congress enacted the African Elephant Conservation Act, 16 U.S.C § 4201 et seq., which imposes additional civil and criminal penalties for the unlawful importation of elephant ivory.  Among the Congressional findings included in the statute is the following: "The United States, as a party to CITES and a large market for worked ivory, shares responsibility for supporting and implementing measures to stop the illegal trade in African elephant ivory and to provide for the conservation of the African elephant."  16 U.S.C. § 4202(8).

Most recently, in connection with the issuance of the National Strategy by the Task Force in February 2014, the White House announced that federal agencies would immediately undertake administrative action to, among other things, prohibit all commercial importation of African elephant ivory, including antiques, and further restrict the sale of elephant ivory within the United States.  (See Exhibit B).

The United States thus has a long tradition of enforcing international laws protecting the African elephant, including by using provisions of the criminal code.

III.    Investigation and Search of the Defendant's Philadelphia Store

Since approximately 2006, the United States Fish and Wildlife Service has been investigating the the illegal smuggling of African elephant ivory from West and Central Africa into the United States.  The investigation has led to the convictions in this District of eight defendants, in addition to the defendant in this case, for smuggling and Lacey Act offenses.  The Court is familiar with the investigation, having presided over the prosecution of, and sentenced, six smugglers involved in the scheme: Kemo Sylla, Drissa Diane, Bandjan Sidime, Mamady

Kone, Seidou Mfomboutmoun and Mamadi Doumbouya.  See United States v. Sylla, et al., 08-CR-906.  These six defendants were arrested pursuant to a complaint unsealed on December 3, 2008 and indicted soon thereafter.  All six eventually pleaded guilty.  The last of the defendants was sentenced in 2011.

Information gathered during the course of the investigation of the Sylla case indicated that a number of these defendants had been selling ivory to the defendant in this case, Victor Gordon.  The defendant owned and operated a business known as Victor Gordon Enterprises, located in a four-story building in downtown Philadelphia.  Further investigation revealed that the defendant's store primarily sold African art.  A sign describing the business as the "most unusual store in Philadelphia" was posted on the door.

Agents conducted surveillance of the store and observed the defendant purchasing what appeared to be African art from a man selling it from the back of a cargo van on the street near his store.  On April 2, 2009, agents entered the store and attempted to interview the defendant.  Inside the store, the agents observed that the majority of the visible retail space on the first floor was cluttered with wood and metal African statues.  The agents also observed a few small pieces of what appeared to be carved elephant ivory.   The agents introduced themselves to the defendant and began to interview him about his store.  The defendant stated that he had been in business since the 1960s and purchased art from African traders who visited the store.  He further stated that he had purchased "tons of ivory" and had plans to donate his collection to a museum.  The defendant initially denied selling ivory, but subsequently acknowledged that he had sold a small amount.

The defendant admitted that he had known Kemo Sylla (who, as noted, had been arrested on December 3, 2008) for a long time and had done business with him.  The defendant

refused to discuss the details of his purchases from Sylla unless he received a non-prosecution agreement from the government. The defendant refused to let the agents search the rear office or basement level of his store.  The agents left.

Later that same day, the agents returned to the defendant's store with a search warrant, which they proceeded to execute.[3]  The search revealed a massive quantity of carved elephant ivory in the rear office and basement of the defendant's building.  Included among the 313 carved ivory tusks and ivory carvings recovered by the agents were large elephant tusks that had been sawed into pieces and were lying on the floor in the basement, in the process of being glued back together again.[4]  Glue had been applied to the tusk sections and was still wet to the touch.  Gordon stated to the agents that he was the person doing the gluing.  In the course of the search, Gordon also identified four ivory carvings and three carved tusks that he had purchased from Sylla.[5]

Some of the ivory carvings found in the defendant's store had been wrapped in newspaper and placed in boxes.  Also in the boxes were notes referencing invoice numbers and indicating to whom the carvings had been sold.  In addition, the agents observed on the bottom of many of the carvings what appeared to be handwritten codes.  Gordon stated that he had written the codes so that he could recall how much he had paid for each item and would therefore know how much to sell it for.

---

[3]      The facts surrounding the search of the defendant's store are further set forth in paragraphs 20 to 23 of the March 22, 2013 Presentence Investigation Report ("PSR").

[4]      Agents advise that ivory tusks are cut up in this manner so that they can be more readily hidden and smuggled through customs.  There is no other rational reason for doing so, as cutting up carved ivory decreases its market value.

[5]      Enclosed as Exhibit G is a computer disk containing video footage taken by agents of the ivory and other items during the search of the defendant's store.

In addition to the ivory, agents found and seized tools, varnishes, stains, packaging, glues, sales receipts, photographs, African art catalogs from the auction houses Sotheby's and Christie's, business cards, appointment books and other items.   On the defendant's desk in the front of the store, agents also found a printed version of a newspaper column, published in the December 13, 2006 edition of Philadelphia Weekly Online, entitled "Art of Darkness."   The column, which is attached hereto as Exhibit H, described a visit to the defendant's store and the author's encounter with a man there, who, the author reported, "tried to sell me ivory sculptures for fractions of the going price, promising me riches beyond my wildest dreams."   The column noted that there was a "global ban on the trade of new ivory."

During the course of the search, Gordon stated he owned the entire building including the three additional floors upstairs.   He said that there was additional ivory on those floors.   The following morning, agents obtained a second search warrant for those floors, as well as for a laptop computer found on the first floor.   Upon executing that warrant, the agents found and seized an additional 115 ivory carvings and tusks on the second and third floors of the defendant's building.

There were no CITES import or export permits found for any of the 428 ivory carvings recovered.

IV.    Analysis of Ivory Recovered from the Defendant

The ivory carvings recovered from the defendant's store, together with additional carvings subsequently surrendered by the defendant and recovered from the defendant's customers,[6] have been examined by Michael Oliver, an expert in African art retained by the

---

[6]    Subsequent to the search, the defendant surrendered 13 additional ivory carvings. Agents also recovered an additional 51 ivory carvings from individuals who purchased ivory from the defendant.

9

government.[7]  Mr. Oliver has concluded that, but for two bracelets and one pendant, none of the carvings are authentic objects made for ritual use by indigenous peoples in Africa.  Indeed, based on the style of the carvings and the presence of staining agents used to make the carvings appear older than they are, Mr. Oliver has found that 86% of the ivory seized from the defendant was carved during the 1990s or later, i.e., after the African elephant was added to CITES Appendix I.  The remaining 14% is of indeterminate age, but likely of recent origin.[8]

   Two ivory masks found in the defendant's store matched masks that had been smuggled into the United States from Africa in 2008.  The masks had been intercepted at the Port of Newark in January 2008, where they were found hidden in a shipping container sent from Douala, Cameroon.  The masks were photographed and cataloged, and then, for investigative purposes, placed back in the shipping container so that they would be delivered to their destination.

   Agents found among the ivory recovered from the defendant's store 6 carved tusks that had been shown by convicted smuggler Drissa Diane to an undercover agent seeking to purchase ivory.  Diane's digital camera, which was recovered and searched following his arrest in December 2008, contained photographs of the tusks taken in the defendant's store.  On December 2, 2008, Diane was recorded telling the undercover agent that the tusks belonged to an "old man" who was a "good friend" of Diane's.  Diane stated that the old man was asking $25,000 for two of the tusks.

---

[7] Mr. Oliver previously testified before Your Honor as the government's expert at the Fatico hearing held in Sylla.  His report in this case and resume are attached hereto as Exhibit I.

[8] Mr. Oliver also assessed the value of the ivory recovered from the defendant as being worth $821,925, which is the appraised value reflected in paragraph 29 of the PSR.

V.    Information Provided by Abutu Sherif

During the course of the investigation, the government interviewed an ivory smuggler named Abutu Sherif regarding his dealings with the defendant.[9]  Sherif, who was born in Liberia and trained as carver, moved to the United States in 1994.  In 2000, he met the defendant and sold him two elephant ivory carvings for $6,000. Sherif lost touch with the defendant but then reconnected with him in 2006, when Sherif needed money.  On four occasions between 2006 and 2009, the defendant paid Sherif to travel to Gabon, Africa to purchase ivory carvings and smuggle them back into the United States.  Typically, the defendant paid Sherif $2,000 to cover his plane ticket and $6,000 to obtain the ivory.  Sometimes, the defendant paid Sherif additional money upon his return to the United States.  To smuggle the ivory, Sherif painted the carvings black so as to make them appear to be ebony wood.  He also cut large tusks into sections, which could be more easily hidden and reassembled in the United States.

Prior to Sherif's departure to Africa, the defendant showed him pictures of ivory carvings in his store and in catalogs and indicated that he wanted Sherif to obtain similar carvings.[10]  The defendant told Sherif that upon arrival in the United States he should never travel directly to the defendant's store from the airport, because he was afraid that law enforcement might be following Sherif.  The defendant and Sherif also discussed methods for

---

[9]     Sherif has pleaded guilty to smuggling elephant ivory pursuant to a cooperation agreement with the government and is awaiting sentencing.  The information provided by Sherif is set forth in further detail in paragraphs 8 to 19 of the PSR.

[10]    Sherif advised that on his most recent trip, he had left with carvers in Gabon photographs of ivory carvings from the defendant's store that the defendant had given him to take to Africa for this purpose.  Upon request by agents, Sherif directed his contact in Gabon to mail the photographs to an address in the United States where the agents would receive them. The agents subsequently received an envelope that had been mailed from Gabon.  The envelope contained pictures of ivory carvings that were photographed in the defendant's store.

staining ivory to make it appear old, including by using potassium permanganate. Sherif brought potassium permanganate to Gordon, who himself used it to stain the carvings. The defendant told Sherif that in the United States, ivory that was 20 years old was legal to sell, but any new ivory was illegal to sell.

In addition to paying Sherif to smuggle ivory into the United States, the defendant also purchased from him a significant number of ivory carvings that Sherif sold him on behalf of other traders. In 2006, the defendant paid Sherif $12,000 for 12 carved ivory leopards. The defendant asked Sherif to fabricate receipts to falsely make it appear that this ivory was at least 20 years old. Sherif made between 8 to 10 false receipts for the defendant. In 2007, the defendant paid Sherif $15,000 for an additional 15 ivory carvings.

VI.    Sales of Ivory by the Defendant

Documents recovered during the search of the defendant's store and bank records subsequently obtained for accounts controlled by the defendant indicate that the defendant has sold a significant amount of ivory during the last decade. Invoices recovered from the defendant's store reflect that, for the just the two-year period February 2007 to March 2009, the defendant sold $46,136 worth of ivory to customers.[11]  Similarly, during the period June 2006 to July 2009, the defendant deposited $38,817 in checks into his bank account that explicitly referenced ivory in the memo line. As certain customers may have paid in cash, credit card or by wire, and others may simply not have referenced ivory on their checks, the actual amount of ivory sold during this three-year period was likely higher.[12]

---

[11]    For the same period, agents found an additional $35,503 in sales invoices for unspecified items.

[12]    Agents found an additional $67,773 in deposited checks for unspecified items.

In the course of the investigation, agents interviewed several customers who had purchased ivory from the defendant.  Customer #1 stated that she was approached by the defendant on the street, while she was standing outside his store.  The defendant asked her, "Would you like to be rich?"  He subsequently brought out ivory from a back room and offered to sell it to her.  The defendant told Customer #1 that he had brought the ivory to the United States before it became illegal to do so.  Customer #1 ultimately purchased two pairs of carved tusks for $7,540.  She later had tusks appraised and discovered that they were worth half of what she paid for them.

Customer #2 stated that he visited the defendant's store while on vacation in Philadelphia.  The defendant offered to sell him ivory carvings, which he claimed were 20 to 30 years old.  Customer #2 stated that he saw some ivory on display, and that the defendant said he had additional ivory in the back.  The defendant showed Customer #2 photographs of carvings in auction catalogs to substantiate how much they had sold for at auction, and said he could sell Customer #2 purportedly similar pieces for a lower amount.  Customer #2 grew concerned that some of the pieces might be fakes and therefore did not purchase anything.  The defendant called Customer #2 after he returned home and told Customer #2 that he had additional ivory for sale.

Customer #3 stated that he and his wife had stopped into the defendant's store while on vacation in Philadelphia.  The defendant brought out ivory carvings from the back of the store and compared them to pieces he showed them in auction catalogs.  The defendant said that all of the ivory was pre-ban and that he had been selling ivory for years.  He also said that he used to travel to Africa, which is how he got into the ivory business.  The defendant further stated that he was very wealthy and was "big into real estate."  The defendant claimed that he

was considering retiring and planned to donate the ivory.  He urged Customer #3 and his wife to invest in ivory and subsequently sold them $6,000 worth of carvings.

Customer #4 purchased two ivory carvings from the defendant for $4,450 after visiting his store in 2007.  The defendant told Customer #4 that his father had obtained the ivory while traveling in Africa in the 1920s, 30s and 40s.  He further claimed that the ivory was very old and pre-dated the ban.  The defendant said that he wanted to donate the ivory to a museum.

VII.   Efforts by the Defendant to Sell his Ivory Collection

Since at least 2004, the defendant has been attempting to sell his business, including his entire ivory collection, for a substantial sum of money.  During the investigation, law enforcement recovered a series of letters from the defendant to his accountant, dated in 2004, 2005 and 2008.  In the letters, which are attached hereto as Exhibit J, the defendant noted the accountant's concern that the defendant "is continuing to purchase inventory even though business had been bad."  In response, the defendant stated that he believed "it will pay off in the end."  In each of the letters, the defendant further stated, "I have been in negotiations with several people who wish to purchase my business and I feel certain that eventually I will finalize a deal.  At that time, my added inventory will be worth much more as it will increase the value of the business."

Separately, agents have obtained evidence indicating that the defendant was in fact in negotiations to sell his ivory collection for $20 million, as part of a "package" deal that would include the remainder of his African art collection and real estate holdings.

Agents interviewed Witness #1, who stated in sum and in part that he was contacted by the defendant, who was seeking a buyer for his African art collection.  Witness #1 traveled to the defendant's store and viewed the defendant's ivory.  The defendant wanted to sell

the ivory, the rest of his African art collection, several buildings and a parking lot as a package

deal.  The defendant told Witness #1 he could acquire the assets and donate the art to receive a

tax write-off.   The defendant further stated that his art collection was worth hundreds of millions

of dollars but he was only seeking $20 million for the package deal.   Ultimately, Witness #1

declined to buy the collection.  He found the defendant evasive on the topic of where he had

obtained the collection.[13]

Agents also recovered from the defendant's store correspondence with Witness

#2, attached hereto as Exhibit L.  In one letter, dated December 13, 2008, Witness #2 thanked the

defendant for showing him his African art collection, and referred to the defendant's offer to sell

it, along with real estate, for $20 million.  A second, unsigned, letter from the defendant to

Witness #2, dated December 17, 2008, confirms the defendant's offer to sell Witness #2 "my

corporation known as Victor Gordon Enterprises, which owns my fabulous collection of African

Art and Artifacts, and other Antiques (European and American), Antique Clocks and many other

items."  The defendant wrote that because Witness #2 had indicated that he wanted the art for "a

museum," he was "willing to sell [Witness #2] a family property known as 240 Market Street" in

Philadelphia and donate four other properties to a charity operated by Witness #2.  The defendant

wrote that price for Victor Gordon Enterprises was $18 million, and the price for the "family

property" was $2 million.

Agents subsequently interviewed Witness #2, who identified himself as a

reverend at the Bible Deliverance Church in Philadelphia and New York, and claimed to operate

a charity called Acres of Diamonds Community Development Corporation.  Witness #2

confirmed that the defendant had offered to sell his business, including his ivory collection,

---

[13]     Agents recovered from the defendant's store correspondence from Witness #1
dated August 10, 2007.  The letter, which is attached hereto as Exhibit K, corroborates Witness
#1's account.

pursuant to the terms outlined in the December 17, 2008 letter.  He further stated that the defendant told him that he wanted to sell his art collection and properties to a tax-exempt charity because the defendant had a long-running feud with the City of Philadelphia over taxes and wanted to avoid paying taxes on the sale, so as to "screw the City."[14]

Agents also interviewed Witness #3, who was identified by Witness #2 as a person he had asked to help raise funds for the proposed transaction with the defendant. According to Witness #3, Witness #2 and the defendant were engaged in a fraudulent tax scheme whereby Witness #2 would pay $20 million to the defendant "under the table" for his ivory collection and properties, and the defendant would account for the transaction as a "charitable" contribution to Witness #2's charity.  At the same time, according to Witness #3, Witness #2 intended to "double-cross" the defendant and pay him an amount less than $20 million.[15]

Finally, agents recovered from the defendant's property a third set of correspondence, with yet another individual to whom the defendant had offered to sell his business for $20 million.  In one of these letters, which is attached hereto as Exhibit M, the defendant stated that he was "offering a fabulous business opportunity" to purchase his business, which consisted of, as he put it, "one of the largest and or the best collections of African Art in the world," plus real estate holdings.  The defendant stated that he was offering to sell the business for $17,500,000, a property lot for $2,000,000 and other properties for $500,000.  As he had indicated to Witness #1, the defendant wrote that "[t]his deal should have many Tax

---

[14]     According to Witness #2, he and the defendant subsequently became engaged in a dispute over a condominium that the defendant was attempting to sell to Witness #2 on behalf of the defendant's girlfriend.

[15]     Witness #3 advised the interviewing agents that he himself had been convicted of receiving a stolen vehicle in 1999 and had served 60 days in jail.

advantages to offset the tremendous profits that you should make," and that "[t]he Art alone should be very profitable especially if it donated to your own Museum."

VIII.   <u>The Defendant's Guilty Plea</u>

On July 15, 2011, the defendant was charged by indictment with one count of conspiracy to smuggle elephant ivory, in violation of 18 U.S.C. § 371, four counts of smuggling elephant ivory, in violation of 18 U.S.C. § 545, and five counts of violating the Lacey Act, 16 U.S.C. § 3372(a)(1).  On September 18, 2012, the defendant pleaded guilty, pursuant to a plea agreement, to a superseding information charging one count of smuggling, in violation of 18 U.S.C § 545.

In paragraph 2 of the plea agreement, the defendant stipulated that "his Sentencing Guidelines range should be calculated based on a market value of at least $400,000 and waive[d] any right to a jury trial or a <u>Fatico</u> hearing in connection with such issue."  The defendant further agreed to forfeit any right or interest in the ivory that had been recovered from his store and his customers, as well as to pay a $150,000 forfeiture money judgment.  The defendant also agreed that any fines imposed by the Court should be paid to the African Elephant Conservation Fund.

In the agreement, the government estimated that if the defendant pleaded guilty and "clearly demonstrates acceptance of responsibility, through allocution and subsequent conduct prior to the imposition of sentence," the applicable Guidelines range would be 30 to 37 months' imprisonment, based on an adjusted offense level of 19 and a criminal history category I.[16]

---

[16]     During the plea proceeding, the government underscored that its estimate applied only if "the defendant accepts responsibility both today and prior to sentence and the period leading up to sentence."  (7/15/11 Tr. at 20).  The government further indicated that the

IX.   The Pre-Sentence Investigation Report

      The PSR found an adjusted offense level of 22 and a criminal history category I,

yielding a Guidelines range of 41 to 51 months' imprisonment.  Significantly, the PSR denied

the defendant a 3-point downward adjustment for acceptance of responsibility under U.S.S.G. §

3E1.1, based on the defendant's statements during his presentence interview with Probation.

Among other things, the defendant denied that he paid Sherif to purchase ivory for him in Africa,

claiming instead that he funded Sherif's trips home so that Sherif could visit with family.

According to the defendant, upon return from Africa, Sherif repaid the defendant with ivory that

Sherif claimed that had been in his family for years.  The defendant denied knowing that the

ivory was illegal.  (PSR ¶ 32-33).

X.   The Defendant's Sentencing Memorandum

      On July 31, 2013, the defendant filed a sentencing memorandum ("7/31/13 Deft.

Mem.")  In his memorandum, the defendant claimed, among other things, that he was effectively

a dupe of unscrupulous African traders who lied to him about the provenance of the ivory they

sold him.  (7/31/13 Deft. Mem. at 7, 12).  The defendant further claimed that he had paid for

Sherif's trips to Africa so that Sherif could tend to his sick mother and, subsequently, attend her

funeral.  According to the defendant, he purchased carved tusks from Sherif in 2009 only

because Sherif said that his life was in danger and he needed money to repay a debt.  (Id. at 9).

The defendant described himself as pursuing a "noble" goal of collecting ivory so that he could

ultimately donate it to a museum.  (Id. at 11).

      After the defendant filed his memorandum, the government advised defense

counsel that, based on the defendant's statements to probation and his denial of relevant conduct

---

acceptance of responsibility adjustment "is predicated on [the defendant] not falsely denying or
contesting relevant conduct prior to sentence."  (Id.)

in his sentencing memorandum, it would take the position at sentencing that he was not entitled to a three-point downward adjustment for acceptance of responsibility under § 3E1.1.  At the same time, the government advised the Court that it anticipated that a <u>Fatico</u> hearing would be necessary to resolve disputed factual issues.

On August 15, 2013, the defendant filed a motion to withdraw his sentencing memorandum, stating that he had "come to realize the full extent of his crimes" and that his memorandum did not "appropriately exhibit acceptance of responsibility."  The Court granted the motion.  On February 7, 2014, the defendant filed a revised sentencing memorandum ("2/7/14 Deft. Mem").  In his revised memorandum, the defendant states that "he has no objection to the facts set out in the [3/23/14 PSR]."  (2/7/14 Deft. Mem. at 5).  The defendant acknowledges that he paid Sherif to smuggle ivory into the United States (<u>Id.</u> at 9) and that he "was looking to make a substantial profit" in selling his ivory collection (<u>Id.</u> at 15).  As a result of the defendant's acknowledgment of his conduct, the government respectfully submits that a 3-point downward adjustment for acceptance of responsibility is appropriate.

<u>ARGUMENT</u>

I.      A Sentence within the Applicable Guidelines Range is Appropriate in light of the Size of the Defendant's Ivory Collection, the Duration of his Criminal Conduct and the Manner in which He Committed the Offense

Having presided over <u>Sylla,</u> the Court is familiar with the devastating impact that the trade in elephant ivory has on the environment, the importance of the issue to the United States (as expressed in its treaty obligations, and more, recently, the establishment of the Presidential Task Force) and the manner in which it is fueling organized crime and violence.  As the Court found at the sentencing of smuggler Drissa Diane, the "importing and selling [of] elephant ivory from the endangered African elephant for financial gain[] is a serious offense

because it encourages the poaching of elephants which leads to violence against law enforcement officers, it heightens the risk of their extinction, and further endangers the overall ecological environment of the African continent." (2/10/11 Diane Tr. at 42-43).[17]

   Other courts have noted that the sentencing ranges called for under the Guidelines – which are tied in substantial part to the market value of the ivory involved in the offense – may in fact understate the seriousness of the crime, given that they do not take into account the totality of the harm caused by the illegal trade in elephant ivory. See United States v. Yacouba, 08-CR-68 (NG) (6/17/08 Tr. at 6) (departing above Guidelines range and finding that "the fair market value of [the smuggled ivory] is both difficult to determine and is only tangentially related to the purposes of the statute, which seeks to protect from destruction the elephants whose tusks are being taken.") More recently, in imposing a 14-month sentence of imprisonment on a defendant who pleaded guilty to the related crime of rhino-horn trafficking, Judge Gleeson observed: "This is a really serious crime. It's very important that the violations of these laws that protect endangered species and prohibit illegal wildlife trafficking, that they be punished severely." United States v. Slattery, 13-CR-615 (JG) (1/10/14 Tr. at 33).

   This case, in particular, presents one of the most egregious examples of an individual flouting the laws against ivory trafficking that has been prosecuted in the United States. It has attracted the attention of the press, of wildlife advocates around the world, and no doubt is also being followed more quietly by those who continue to smuggle and trade illegal ivory. See Exhibit N (news articles reflecting coverage of the case). Attached as Exhibit O is a letter from Lee White, the Executive Secretary of National Parks in Gabon, Africa, where much of the illegal ivory offered for sale in the United States and elsewhere is poached. In his letter,

---

[17]  The government will provide copies of all transcripts cited herein to the Court or defense counsel upon request.

Mr. White asks that the Court "send a strong message by imposing a tough sentence" on the defendant, noting that "the greed of people like [the defendant]" puts the "lives of my people, and others like them in the region, at risk." Indeed, the sentence imposed by the Court in this case will have a significant impact on future efforts to address the crisis of the African elephant and affect the prosecution of wildlife and environmental crimes more generally.

By every measure, the nature and circumstances of the defendant's crime call out for the "tough sentence" requested by Mr. White and required by 18 U.S.C. § 3553(a) in this case:

- Over the course of more than a decade, the defendant amassed what the government believes to be the largest collection of illegal elephant ivory in the United States heretofore uncovered by law enforcement.

- The defendant purchased his ivory directly from smugglers and placed orders for them to obtain ivory directly from Africa. On at least four occasions, the defendant paid one of those smugglers, Abutu Sherif, to travel to Africa, purchase ivory, have it carved in a manner specified by the defendant, and then secret it into the United States. He asked Sherif to fabricate receipts to falsely show that ivory he purchased pre-dated the CITES ban. (PSR ¶¶ 9-19).

- The defendant did so fully aware that his actions were criminal. Indeed, he did so brazenly: He paid Sherif to smuggle ivory in early 2009, just months after the government arrested the Sylla defendants for ivory trafficking, an arrest that was covered in the national press, and of which the defendant was surely aware, given his prior business dealings with those defendants. (See Exhibit P ("U.S. Accuses 6 of Smuggling Disguised Elephant Ivory," N.Y. Times, Dec. 4, 2008)). He instructed Sherif to be wary of law enforcement, directing him to avoid traveling from the airport to his store.

- Until the defendant's store was raided, the defendant had been selling illegal ivory commercially for years, collecting tens of thousands of dollars in proceeds. He sold ivory that had been stained to make it appear older than it was, and lied to his customers about its provenance, telling them, among other things, that he himself had purchased the ivory in Africa years ago. Before he was arrested, the defendant sought to offload his entire ivory collection for millions of dollars.

- The defendant was not driven to commit these crimes by financial hardship or similarly desperate circumstances. Indeed, the PSR reflects that the defendant's current net worth is $1.9 million, even after surrendering his ivory collection and

paying a $150,000 money judgment.  (PSR ¶ 76).  He has no history of mental or emotional health problems.  (PSR ¶ 68).

On top of all of this, the defendant's acceptance of responsibility has been faltering, at best.  In an effort to minimize his crimes, he lied to the Probation by denying that he had paid Sherif to obtain ivory in Africa and smuggle it into the United States.  (PSR ¶ 32).  After withdrawing his first sentencing memorandum – in which he continued to minimize and falsely deny relevant conduct – the defendant filed a sentencing memorandum that concedes the facts set forth in the PSR, but hardly reflects a whole-hearted and honest acknowledgment of wrongdoing.  While admitting that he paid Sherif to obtain ivory in Africa (2/7/14 Deft. Mem. at 9), the defendant portrays himself as having a "unique personality" that "made it very hard for [him] to realize the extent to which some of his involvement in the trade and collecting of ivory was both morally wrong and criminally punishable."  (Id. at 17).  He continues to claim that he has "long intended to establish a museum of African art " and that his desire to create a museum was "for many years . . . [his] over-riding motivation in expanding his African art collection." (Id. at 14).  The facts in the record - including the correspondence with Witnesses #1 and #2, described above and attached as Exhibits K and L - establish that the defendant's "vision of establishing an African art museum to benefit the public" (2/7/14 Deft. Mem. at 15) was nothing more than a ruse designed to avoid paying taxes and to put more money in the defendant's pocket.

Thus, while admitting enough, in the government's view, to warrant a three-point downward adjustment under § 3E1.1, [18] the defendant continues to demonstrate a remarkable lack of contrition in light of the nature and scope of his crimes.

---

[18]     If the defendant reverses course and contests the facts set forth in the PSR or otherwise falsely denies relevant conduct at, or prior to, sentencing – whether it be in filings with the Court, through his own statements, or through the presentation of witnesses at sentencing –

II.     The Defendant Should Receive a Longer Sentence than those Imposed on the Defendants in Sylla

        In his memorandum, the defendant suggests that he is less culpable that the defendants in Sylla, and thus should receive a lesser sentence than those imposed by the Court in that case.  In fact, there is every reason for the Court to impose a more significant sentence in this case.  The six defendants in Sylla were African immigrants of limited financial means, in many cases supporting large families in Africa, who sold ivory to men of more significant financial resources in the United States, like the defendant.  The Court's sentencing of Mamadi Doumbouya – who received the longest sentence (14 months' imprisonment) of the six – is instructive.  The Court characterized Doumbouya's family circumstances as "very compelling and very sympathetic," noting that he was one of ten children born in the Ivory Coast and "raised under very difficult economic conditions."  (7/17/12 Doumbouya Tr. at 42-43).  Doumbouya regularly sent money to his wife, two small children and extended family in Africa, helping to pay for schooling and basic needs.  (Id. at 45).  He expressed contrition at sentencing, stating that he was "deeply sorry for the harm I caused" and admitting that "I was involved in illegal ivory smuggling trade and that was a crime, and my actions caused elephants to be killed, herd [sic] and harm the environment."  (Id. at 10).

        In imposing a sentence of 14 months – which was at the mid-point of the applicable Guidelines range of 10 to 16 months' imprisonment – the Court noted that it was troubled by Doumbouya's two prior misdemeanor convictions for wildlife offenses, the three-year span of his conduct in the that case and the fact that the offense involved "smuggling extensive quantities of ivory."  (Id. at 49).  The market value of the ivory in Doumbouya's case was $98,480.  That number is dwarfed by the value of the ivory involved in the defendant's case,

_____

the government will take the position at sentencing that the defendant is not entitled to the adjustment under § 3E1.1.

which, as noted, the defendant has stipulated is greater than $400,000.  And while the defendant

has until now escaped prosecution for his crimes, and thus does not have a criminal record, the

PSR reflects that he first started purchasing ivory from Sherif in 2000 – almost a decade prior to

the date his ivory collection was seized by law enforcement.  The defendant was thus involved

with a far larger quantity of ivory for a longer period of time that Doumbouya, has shown less

remorse and presents significantly less sympathetic personal circumstances.  As noted, he

continued to pay Sherif to smuggle ivory, even after the Sylla defendants were arrested.

   In his memorandum, the defendant requests a non-custodial sentence.  In light of

the sentences received by Doumbouya and the other Sylla defendants, such a sentence in this

case would be inconsistent with a fair assessment of punishment in these cases.  Indeed, the only

defendant to receive a non-custodial sentence in Sylla – Mamady Kone – pleaded guilty to a

misdemeanor, rather than a felony offense, in connection with picking up and delivering a single

shipment containing African elephant ivory, worth between $15,000 and $20,000.  (7/22/10

Kone Tr. at 19, 27).  The applicable Guidelines range in Kone's case was 6 to 12 months'

imprisonment, compared to the 30 to 37 months applicable here.  (Id. at 20).  The Court further

found that Kone had an unspecified "chronic illness," had children and step-children dependent

on him, and was "deeply remorseful" for his crime.  (Id. at 24-26).  In fact, the circumstances of

Kone's case and his lesser role in the scheme were such that the government agreed that a

sentence of probation and a fine would be appropriate.  (Id. at 14).  In light of the scope of the

defendant's wrongdoing in this case and all of the other facts set forth herein, there is no basis

for the Court to impose the same sentence that it imposed in Kone's case.[19]

---

[19]  The defendant also cites United States v. Xu, 11-CR-777 (JBW), in support of his
request for a non-incarceratory sentence.  In Xu, the defendant was apprehended while trying to
smuggle out of the United States into China elephant ivory worth approximately $50,000.  (See
Docket No. 17 ("Joint Factual Statement")).  As in Kone, the illegal conduct in Xu involved far

In his survey of recent sentences relating to the smuggling of elephant ivory, the defendant omits to mention the sentence in United States v. Qiang Wang, 13-CR-452 (S.D.N.Y.), which was imposed in December 2013, more recently than any other sentence discussed in the defendant's memorandum.  In Wang, the defendant pleaded guilty to counts of conspiracy and smuggling relating to his participation in a scheme to smuggle elephant ivory and rhino horn out of the United States and into China.  The court found the applicable Guidelines range to be 37 to 46 months' imprisonment and imposed a sentenced of 37 months' imprisonment.  (1/16/14 Wang Tr. at 43).  In addressing the sentencing factors under 18 U.S.C. § 3553(a), the court found that there were "few cases . . . where general deterrence is as important because of the nature of the case, the newness, and the relatively strong emphasis more recently being put upon it."  (Id. at 40.)  With respect to the nature of the offense, the court observed that the defendant's "position was as a buyer and seller of objects which helped to create and sustain a marketplace for products made from endangered wildlife, which then increases the potential for poaching and for the extermination of a very significant species . . . it's something that our country takes very seriously."  (Id. at 36-37).  The court further noted that it was troubled by the fact that the defendant (like the defendant here) continued to engage in wrongdoing even after one of his co-conspirators was arrested and jailed.  The court found that this fact "highlights for the Court the intentionality of the conduct and the fact that what [the defendant was] doing was deliberate, it was repetitive."  (Id. at 38).  The court imposed a 37-month sentence despite the fact that the defendant had proffered information to the government, had previously worked in a Buddhist monastery, was "from a family which has had some misfortune" and had a mother who was ill. (Id. at 10, 42).

---

less ivory and took place over a much shorter period time.  The case thus does not support the defendant's claim that the purposes of sentencing could be served in his case by imposition of a period of probation and a fine.

In light of the above, the government respectfully submits that, in this case, a sentence within the applicable Guidelines range of 30 to 37 months is necessary to address the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

III.     The Defendant has not Identified any Compelling Mitigating Circumstance

In support of his request for a non-custodial sentence, the defendant argues that his "advanced age, including his related declining physical and mental health, as well as his family health history" support a non-custodial sentence.  (2/7/14 Deft. Mem. at 26).  The defendant is 71 years old, certainly older than the average defendant, but no so old as to make the sentence of imprisonment called for by the Guidelines unduly harsh or an effective "life" sentence.  The defendant claims that he has "serious medical conditions" relating to his age, but identifies only an apparently asymptomatic heart murmur and that fact that he "bleeds anally nearly every day."  He also claims to have "antibodies in his blood that require close monitoring because they are markers for cancer."  (Id. at 26).  The defendant has not indicated what, if any, affect these conditions have on his daily routine, much less demonstrated that they could not be effectively addressed by medical staff at the Bureau of Prisons.  They are certainly not "serious" medical conditions that outweigh the substantial need, pursuant to the other § 3553(a) factors, to impose a period of incarceration in this case.

Nor is the defendant's claim of "deteriorating mental health" credible.  (Id.)  The PSR reports that, according to the defendant's daughter, "the defendant has no history of mental or emotional health problems."  (PSR ¶ 68).  The defendant attaches to his memorandum three reports written by a psychologist hired by his counsel to examine the defendant.  (See Appendix G to 2/7/14 Deft. Mem.)  As is reflected in first of these reports, the examining psychologist apparently took at face value the defendant's claim, since retracted, that Sherif "manipulated"

him, and concluded that the defendant had a "somewhat naïve view of the world."  In that first

report, the psychologist concluded:

> It is my opinion that he combination of wanting to acquire things as part of part of
> his Obsessive Personality traits, and his history of being a collector since a
> teenager, combined with his personality dynamics as discussed above, contributed
> to his lack of recognition that there was a likelihood that the ivory he was being
> sold had been illegal imported, and to a lack of insight into how he was being
> manipulated by Abutu and Kemo.

(Id. at G-12).  That conclusion was completely undermined by the defendant's subsequent

acknowledgment that, rather than being tricked by Sherif, he paid Sherif to go to Africa, acquire

ivory and then smuggle it back into the United States, and had discussed with Sherif steps he

should take to avoid detection by law enforcement.  In his third and final report, the psychologist

himself acknowledged as much, noting:

> A change from the original report to the present is, however, one of now recognizing the
> wrongfulness of his actions that resulted in the legal charges.  While previously he felt
> that he was tricked to some degree, he now accepts responsibility for his role, and admits
> the actions enumerated in the PSR.

(Id. at G-21).

In any event, while defendant's psychologist maintains that the defendant has

"Personality Disorder, Not Otherwise Specified, with Obsessive Compulsive Features," the

defendant has not identified any psychological ailment or condition that mitigates his culpability

in this case or warrants imposition of a lower sentence.  Notably, the defendant told the

psychologist that during the nearly three years this case has been pending, he has not entered into

psychotherapy, claiming that "he makes little money, and a large amount goes to his lawyers."

(Id. at G-16).  The PSR reflects that the defendant has sufficient funds to pay for treatment, had

he suffered from a psychological condition that he believed needed to be addressed.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that the defendant should receive a sentence within the applicable Guidelines range of 30 to 37 months' imprisonment.

Dated: Brooklyn, New York
          May 14, 2014

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney
Eastern District of New York

By:      /s/
         Darren A. LaVerne
         Assistant U.S. Attorney
         718-254-6783

cc:      Clerk of Court (KAM) (By ECF)
         Daniel-Paul Alva, Esq. (By ECF)
         Angelica Deniz, United States Probation Officer (By Email)

28